UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

HILTON HEAD HOLDINGS b.v., on its own behalf and derivatively on behalf of ART CAPITAL GROUP, INC

       Plaintiff,

               v.

IAN PECK AND ART CAPITAL GROUP, INC.; FINE ART FINANCE, LLC; ART CAPITAL GROUP, LLC; ACG CREDIT COMPANY, LLC; ACG FINANCE COMPANY, LLC; ACG CREDIT COMPANY II, LLC; ACG CREDIT COMPANY III, LLC; ACG FINANCE COMPANY III, LLC; AMERICAN PHOTOGRAPHY LLC; and other Unknown, Affiliated Business Organizations that cannot be readily identified at this time.

       Defendants.

Docket No. 11-CV-07768 (KBF) (MHD)

---

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND STAY DISCOVERY**

S. George Alfonso
The Law Offices of S. George Alfonso
5340 Alpha Road
Dallas, Texas 75240
(972) 458-6800
geoalfo@aol.com

*Attorneys for Plaintiff*

Joseph P. Leon, Esq. (JL-6049)
The Law Offices of Joseph Leon, PLLC
33 West 19th Street, Fourth Floor
New York, New York 10011
(917) 607-6915
joeleon@gmail.com

*Attorneys for Plaintiff*

Plaintiff, by its co-counsel, The Law Offices of S. George Alfonso and The Law Offices of Joseph Leon, PLLC, hereby submits this Memorandum of Law in opposition to Defendants' Motion to Dismiss and Stay Discovery.[1]

## PRELIMINARY STATEMENT

Defendants attempt to characterize the Complaint as a "monument to the shareholder strike suit."[2]  More to the point, this lawsuit is a monument to the eternal truism that a controlling shareholder is highly unlikely to direct a corporation he controls to sue himself, which is why the derivative suit exists.

The core factual allegations in the Complaint are that Defendant Ian Peck - Chairman, CEO and controlling shareholder of ACG Inc. - created a web of other business entities (the "ACG Affiliates") - for which he was also Chairman, CEO and controlling shareholder.  The ACG Affiliates all operated in the same competitive space as ACG Inc., and were used by Peck to misappropriate business opportunities properly belonging to ACG Inc.  The opportunity in question was structuring, offering and servicing loans to artists, owners and art galleries secured by interests in fine art assets ("FABL's"). As the Chairman, CEO and controlling shareholder of the ACG Affiliates, Peck was able to di-

---

[1]  Party names and other capitalized terms shall be as set forth in Plaintiff's Verified Complaint.

[2]  With respect to Plaintiff's shareholder status, Defendants allege that Plaintiff owns 0.85% of ACG Inc. Thus, Defendants admit Plaintiff's shareholder status, but it should be noted that Plaintiff disputes that it only owns 0.85% of ACG Inc. The exact amount of the ownership interest remains to be determined.  The Subscription Agreement states that ACG Inc. was selling 1 million shares at $6 per share, such that Hilton Head's purchase of 41,667 shares for $250,000 would equal an interest of 4.17%.  Any dilution of these shares, if it occurred, is not before this Court on this motion.

rect this coordinated scheme without interference.

As described in the Statement of Facts, the Complaint fleshes out these factual allegations in generous detail, which are not, as Defendants argue, "legal conclusions" or "formulaic recitations of the elements of a cause of action." They are well-pleaded factual allegations that must be taken as true on a motion to dismiss, and that give rise to entirely "plausible" claims for breach of fiduciary duty and tortious interference.

Moreover, these well-pleaded factual allegations give rise to wholly plausible claims claims for aiding and abetting, civil conspiracy and alter ego liability - the reason being that Defendant Peck was Chairman, CEO and controlling shareholder of the ACG Affiliates, such that intentional coordination among this entities is not only a reasonable inference from the facts, but a certainty.

Moreover, the well-pleaded factual allegations give rise to the necessary inference that this scheme was carried out by Defendant Peck using the ACG Affiliates with malice aforethought, such that punitive damages are available for these intentional torts.

## STANDARD OF REVIEW

Under the pleading standards of Rule 8(a), a complaint must contain a short and plain statement of the claim showing that the plaintiff is entitled to relief. To satisfy this standard, a complaint need not contain detailed factual allegations:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint. Bell Atlantic Corp., supra, at 555 – 556, 127 S.Ct. 1955 (citing Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); Neitzke v. Williams, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

Erickson v. Pardus, 551 U.S. 89, 93-94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (U.S. 2007).

At the same time, the court need not accept as true factual allegations that are not well-pleaded.

> As the Court held in [Bell Atlantic Corp.], 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. Id., at 555, 127 S.Ct. 1955 (citing Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127 S.Ct. 1955.

> Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." Id., at 557, 127 S.Ct. 1955.

Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009).

Using these rules of construction, the court determines the universe of well-pleaded facts, and then determines whether these facts are sufficient to establish that the claims for relief are more than just conceivable, but are in fact "facially plausible." "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Bell Atlantic Corp., supra, 129 S.Ct. 1937, 1949.

### A.   Documents Extrinsic to the Complaint

Defendants continuously reference documents extrinsic to the complaint.  However, in determining whether a complaint states a claim, a district court is typically required to look only at "the allegations on the face of the complaint." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir.2007).

In some circumstances, the court may permissibly consider "documents attached to the complaint or incorporated by reference in the complaint," as well as "documents 'integral' to and relied on in the complaint," but none of those circumstances exist here. Id.

However, and this is a limitation that Defendants fail to observe.  It is not enough that a document is relevant to a factual allegation or raises a disputed issue of fact. Rather, the plaintiff must have relied upon the terms *and effect* of a document in drafting

the complaint.  Thus, where a complaint relies upon obligation created by contract, the court may consider the actual terms and effect of the contract. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2nd Cir. 2002) (court properly relied on contacts but not codes of industry fair practice).

All of the extrinsic documents relied upon by Defendants should thus be disregarded, including:

- Self-serving letters from Defendants' counsel expressly containing "confidential settlement communications" (dated September 22, 2011 (Def. Ex. 1) and September 9, 2011 (Def. Ex. 2).

- Attachments to Defendants' self-serving letter of September 22, 2011 (Def. Ex. 1), including:  (i) Tax Returns from 2000 to 2003 for ACG Inc.; and (ii) certain certain corporate filings and other papers for ACG Inc. f/k/a FineArtLease.com.

- Attachments to Defendants' self-serving letter of September 9, 2011 (Def. Ex. 2), including:  (i) a 2001 Executive Summary describing ACG Inc.'s business plan, (ii) a 2001 "One Pager" describing same, and (iii) certain certain corporate filings and other papers for ACG Inc. f/k/a FineArtLease.com.

- Summons and Complaint for Art Capital Group, Inc. v. Annie Leibovitz, Index No. 09-602334 (Supreme Court, NY County, filed July 29, 2009) (Def. Ex. 3).

- Email from Diederick van Eck, as representative of Plaintiff Hilton Head, to Defendant Peck, dated April 2, 2007 (Def. Ex. 5).

- News articles from the New York Times, Wall Street Journal and Associated Press from 2005, 2007 and 2009 (Def. Ex. 6 though 9).

- Online report from Trademark Electronic Search System regarding trademark for "Art Capital Group" (Def. Ex. 10).

### STATEMENT OF FACTS

As noted above, the core factual allegations in the Complaint are that Defendant Ian Peck - Chairman, CEO and controlling shareholder of ACG Inc. - created a web of other business entities, the ACG Affiliates - for which he was also Chairman, CEO and controlling shareholder.  The ACG Affiliates all operated in the same competitive space as ACG Inc., and were used by Peck to misappropriate business opportunities properly belonging to ACG Inc.   The opportunities in question was for structuring, offering and servicing FABL's. As the Chairman, CEO and controlling shareholder of the ACG Affiliates, Peck was able to direct this coordinated scheme without interference.

### A.      ACG Inc. competed in the space for Fine Art Backed Loans (FABL's)

The allegation that ACG Inc. competed in the FABL space is supported by a series of duly specific factual allegations showing that ACG pursued <u>any</u> opportunity using fine art as a viable asset class for financing.  As long as a transaction involved valuing fine art, including as a viable collateral asset, it was within the scope of ACG's Inc.'s business.

Specifically, when it first formed in 1999, ACG Inc.'s business consisted of structuring and servicing transactions, whereby art owners turned their art works into cash-generating assets by exhibiting them at museums and other locations, for which ACG Inc. received fees and commissions ("Museum Exhibition Services"). (Compl. ¶18).

Subsequently, ACG Inc. expanded its business to include structuring and servicing transactions, whereby art owners would turn their art works into cash-generating assets by leasing them to private corporations and other entities for display, for which ACG Inc.

received fees and commissions ("Museum Leasing Services"). (Compl. ¶19).

Next, ACG Inc. raised capital, pursuant to the 2001 offering made to Plaintiff and others,  in order to expand aggressively as "the Financial Services Company for the Art World" and pursue opportunities for using fine art as a viable asset class for financing, including: a) financing programs for art merchants to finance purchases of works of art ("Merchant Services"); b) sale and leaseback arrangements with tax benefits for corporations; and c) offering lease-to-purchase arrangements for individuals and corporations. (Compl. ¶21).

On April 10, 2001, consistent with this business mission, and several months prior to Hilton Head's purchase of ACG Inc., ACG Inc. filed a trademark application for "Art Capital Group," which was subsequently granted on January 2, 2007, which reserved the "Art Capital Group" trademark for various purposes, including "financial services." (Compl. ¶22).

Subsequently, ACG Inc. also provided financial and consulting services to artists and art owners, and provided loans to artists, owners and art galleries secured by interests in fine art assets (FABL's). (Compl. ¶24).

Among other services, ACG Inc. offered recourse and non-recourse asset-based loans (FABL's) to artists, individuals, galleries, and other businesses utilizing their fine art assets as the collateral securing the loan or as a component of the collateral package. (Compl. ¶25).

These are highly specific allegations that clearly set forth a business purpose that includes competing for FABL's as a form of transaction that offered financial services related to fine art, and in particular, used fine art as a viable asset class for financing.

Thus, there is little question that, as a factual matter, it has been well-pleaded by factual allegations that ACG Inc. competed for the exact corporate opportunities diverted by Defendant Peck to the ACG Affiliates.

**B.      All Defendants Knowingly and Intentionally Participated in the Diversion of Corporate Opportunities**

From May 6, 2003 through August 29, 2008, Defendant Peck formed the ACG Affiliates.  (Compl. ¶¶27-33). Defendant Peck is the Chairman, CEO and controlling shareholder of all the ACG Affiliates.  Id.  At the present time, it is impossible to say exactly how many ACG Affiliates Defendant Peck has created, but it beyond dispute that any action by one ACG Affiliate is done with the full knowledge and cooperation of Defendant Peck, and therefore, all other ACG Affiliates.  (This point will be relevant in discussing causes of action for conspiracy, aiding and abetting and alter ego liability.)

**C.      ACG Inc. remains a going business concern**

Defendants base much of their motion on the bald assertion that ACG Inc. is a "failed" company.  "By the end of 2003, the decision was made to cease ACG Inc.'s primary operations due to its enormous losses. In short, HHH is shareholder in a failed company."  (Def. MOL p.1 ¶2).  See also Id. p.1 ¶¶2,3; p.6 ¶1; p.13 ¶2 and fn. 4).

"Failed" is not a recognized legal status, and Defendants admit that ACG Inc. is

not dissolved or wound down or in bankruptcy proceedings.  In fact, it is entirely unclear what Defendants mean by calling ACG Inc. a "failed" company.  It is also unclear what the relevance is to this motion, but as Defendants focus so much of their energies on this point, it will be addressed.

However, it will be addressed, because much of the documents and information raised by Defendants actually supports Plaintiff's argument that ACG Inc. is entitled to the FABL opportunities diverted by Defendants.

First, in an article in the New York Times (Def. Ex. 3) , Defendant Peck was interviewed and reported that (a) in 2008, an entity named ACG (Inc. or LLC is not specified) made approximately $80 million in loans secured by fine art; and b) in 2009, ACG forecasted making approximately $120 million in such loans.

Second, in a Complaint filed by ACG <u>Inc.</u> on June 29, 2009 (Def. Ex. 6), it sued famous American photographer Annie Leibovitz to enforce the terms of various loan agreements that gave ACG Inc. certain rights in exchange for arranging a $25 million loan to Ms. Leibovitz made by ACG Inc. affiliate, American Photography.

Strangely, Defendants included the original complaint from The Leibovitz Litigation as part of Defendants' Exhibits, but failed to include Exhibit A to Leibovitz Complaint – the "Sales Agreement" which served as the basis for claim.  The omitted Sales Agreement was signed by Defendant Peck, on behalf of ACG Inc., the Plaintiff, and signed by Defendant Peck on behalf of Defendant American Photography, LLC, the entity described in the Complaint as an "affiliate" of ACG Inc. (See Def. Ex. 3 ¶¶

1,2,4,5,15,17,28 and 29).

# ARGUMENT

## I.

## THE COMPLAINT SHOULD NOT BE DISMISSED FOPR FAILURE TO STATE A CLAIM

### A.    The Cause of Action for Breach of Fiduciary Duty Is Not Time Barred

Breach of fiduciary duty is subject to a six-year statute of limitations. Therefore, any diversions of corporate opportunity by Defendant Peck constituting a breach of fiduciary duty and occurring on and after July 25, 2005 is not barred by the statute of limitations.

Pursuant to CPLR 213(7), a six-year limitations period applies to claims by a corporation for breach of fiduciary duty, because it is "an action by or on behalf of a corporation against a present or former director, officer or stockholder for an accounting, or to procure a judgment on the ground of fraud, or to enforce a liability, penalty or forfeiture, or to recover damages for waste or for an injury to property or for an accounting in conjunction therewith." Skorr v. Skorr Steel Co., Inc., 29 A.D.3d 594, 814 N.Y.S.2d 250 (2d Dep't 2006) (Shareholder derivative claims alleging misappropriation of corporate opportunity, diversion of corporate assets, and breach of fiduciary duty were subject to six-year statute of limitations).

As stated in Whitney Holdings, Ltd. v. Givotovsky, 988 F. Supp. 732, 741-742 (S.D. N.Y. 1997) (applying New York law):

> Where, as here, a corporation sues a former officer, director
> and shareholder for breach of fiduciary duty, CPLR § 213(7)

> governs. * * * Defendant's contention that the general provi-
> sion for "injury to property" found in Section 214(4) controls
> over this more specific period in Section 213(7) is frivolous.
> The legislative history of Section 213(7) and principles of
> statutory construction make clear that Section 213(7) sup-
> plants all other statutes of limitation potentially applicable to
> a suit on a corporation's claim against its director, officer or
> shareholder.

The statue of limitations begins to run anew for each separate cause of action based on each separate diversion of corporate opportunity.   Delemos v. White, 173 A.D.2d 353, 354, 569 N.Y.S.2d 723, 724 (1st Dept.1991) (in breach of fiduciary duty case, finding that "a new cause of action accrued each time defendant collected the rents and kept them to himself."). Thus, any diversions of corporate opportunity by Defendant Peck constituting a breach of fiduciary duty and occurring on and after July 25, 2005 is not barred by the statute of limitations.

Further, this case is appropriate for the continuing wrong doctrine, where the limitations period does not begin to run so long as the wrong constituting the cause of action continues.

## B.    The Cause of Action for Breach of Fiduciary Duty States a Claim

It could not be clearer that the well-pleaded facts set forth a plausible legal claims.

The core factual allegations in the Complaint are that Defendant Ian Peck - Chairman, CEO and controlling shareholder of ACG Inc. - created a web of ACG Affiliates - for which he was also Chairman, CEO and controlling shareholder.  The ACG Affiliates all operated in the same competitive space as ACG Inc., and were used by Peck to misap-

propriate business opportunities properly belonging to ACG Inc.  The opportunity in question was structuring, offering and servicing loans to artists, owners and art galleries secured by interests in fine art assets.

As described in the Statement of Facts, the Complaint fleshes out these factual allegations in generous detail, which are not, as Defendants argue, "legal conclusions" or "formulaic recitations of the elements of a cause of action."  They are well-pleaded factual allegations that must be taken as true on a motion to dismiss, and that give rise to entirely "plausible" claims for breach of fiduciary duty and tortious interference.

Defendant's argument to the contrary is simply illogical.  In arguing that the primary core of factual allegations fails to state a claim, Defendants sole argument is that Defendant Peck did not divert any FABL opportunities from ACG Inc., because ACG Inc. was allegedly not a "lender."

> [T]he Complaint is founded in large part on a simple deceit, namely that ACG Inc. is a lender. But ACG Inc. is not a lender. Nor, as its formation documents make plain, did ACG Inc.'s shareholders have any expectation that ACG Inc. would be a lender. HHH's deceit allows it to assert, albeit insufficiently, that Mr. Peck breached his fiduciary duty by diverting lending opportunities to Art Capital Group, LLC ("ACG LLC"), which is a lender, and away from ACG Inc. That, in one sentence, is the entire Complaint. HHH's ploy should be rejected.

(Def. Mem. of Law, p.2 ¶ 1))

This argument is wholly without merit.  Plaintiff never alleged that ACG Inc. participated or competed to participate in FABL's solely as a "lender," i.e., by using its own

capital to make loans.  ACG Inc. may well have done so, but it also participated or competed to participate in offering, arranging, and servicing FABL's.

**C.    The Cause of Action for Aiding and Abetting States a Claim**

As Defendants point out, Plaintiff pleads the cause of action against the ACG Affiliates for aiding and abetting the torts committed by Defendant Peck for one simple reason.  It had already laid an extensive factual basis for the cause of action in the portion of the complaint setting out the factual allegations.  The portion setting our the varied causes of action arising from these facts did not need to be that extensive.

The relevant facts are that Defendant Peck was the Chairman, CEO and controlling shareholder of ACG Inc. and the ACG Affiliates.  Thus, it is an entirely reasonably inference from these well-pleaded facts that Peck was able to direct a coordinated scheme with the Defendants without interference.  In fact, it strains logic to argue that Defendants would not have intentionally and knowingly participated in the intentional torts of Defendant Peck.  Pursuant to the scheme described, each would have took actions in furtherance thereof as instruments of Defendant Peck, using the corporate form to commit injustice.

**D.    The Cause of Action for Tortious Interference States a Claim**

The facts discussed in Section I.B. establish a plausible claim not only for breaching fiduciary duty, but also for tortious interference, and the court is respectfully referred to the discussion therein.

**E.     The Cause of Action for Civil Conspiracy States a Claim**

The facts discussed in Section I.C. establish a plausible claim not only for aiding and abetting, but also for civil conspiracy liability, and the court is respectfully referred to the discussion therein.

**F.     The Cause of Action for Alter Ego Liability States a Claim**

The facts discussed in Section I.C. establish a plausible claim not only for aiding and abetting, but also for civil conspiracy liability, and the court is respectfully referred to the discussion therein.

**G.     Hilton Head's Claim for Common Law Dissolution is Valid**

Defendants argues that a court has no jurisdiction to order the dissolution or winding-up of a foreign corporation, but that is dead law.  Current law, more consistent with the nature of modern interstate commerce, where nominally foreign corporations have all their contacts in the local jurisdiction, local courts have jurisdiction to both wind-up and dissolve foreign corporations.[3]

Thus, New York courts have expressly held that they do have jurisdiction to dissolve a foreign corporation.  In re Dissolution of Hospital Diagnostic Equipment Corp., 205 A.D.2d 459, 613 N.Y.S.2d 884 (1st Dep't 1994) (rejecting the argument "that the courts of New York lack subject matter jurisdiction to dissolve a foreign corporation")

---

[3] "Dissolution" of a corporation is the termination of its existence as an entity which may accrue rights and duties or incur liabilities and obligations. In contrast, "winding up" a corporation means its "liquidation," including gathering up its assets, paying its debts, and apportioning the profit or loss to shareholders.  Am. Jur. 2d, Corporations § 2348.

Further, the New York courts have held that they may involuntary wind up a nominally foreign corporation when it appears that:

- all of the foreign corporation's business was done in the forum state • all of its records are kept in the forum state

- all of the foreign corporation's officers, directors, and shareholders kept their domicile in the forum state

- the corporation was a foreign corporation in legal creation only

- to remit the parties to a court in the state of incorporation would amount to a practical denial of justice

Application of Dohring, 142 Misc. 2d 429, 537 N.Y.S.2d 767 (Sup 1989). See also Restatement Second, Conflict of Laws § 300 (A State may, without terminating the existence of a foreign corporation, wind up its business in the State.)

Defendant's cases to the contrary are inapposite.

First, Defendant cites In re Warde-McCann v. Commex, Ltd., 522 N.Y.S.2d 19, 19 (App. Div. 1987), for the proposition that "a foreign corporation is controlled, as to its dissolution, by the laws of its domicile."

Second, Defendants cite Sokol v. Ventures Educ. Sys. Corp., 2005 WL 3249447, at *3 (N.Y. Sup. Ct. June 27, 2005) for the proposition that a Delaware corporation "may be dissolved only by order of a Delaware court."

Finally, Defendants cite Nixon v. Blackwell, 626 A.2d 1366, 1380 (Del. 1993) for the proposition that Delaware law does not recognize a cause of action for common law dissolution or buy-out.

**H.**      **Hilton Head's Request for Punitive Damages Is Proper**

Plaintiff seeks punitive damages for both (i) the substantive, intentional torts of breach of fiduciary duty and tortious interference with business relations; and (ii) the derivative torts of "aiding and abetting," "civil conspiracy" and "alter ego" with respect to these substantive, intentional torts.

Defendants are correct that, with respect to all five causes of actions, Plaintiff's claim for punitive damages recites that same legal conclusion that the unlawful conduct was "willful, malicious and with intentional disregard for the rights of ACG Inc."  But that legal conclusion is, in each case, backed by the same egregious course of conduct. The fact that a single set of facts give rise to a series of legal theories, all of which may be pleaded in the alternative, does not render the claim for punitive damages defective.

To the contrary, in New York, punitive damages are recoverable for a wide variety of intentional torts if the plaintiff proves that the defendant committed the tort and demonstrates the existence of " 'circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called willful or wanton.' " Carvel Corp. v. Noonan, 350 F.3d 6, 24 (2d Cir. 2003) (citations omitted).

There is little doubt that the factual allegations in this case, if proved, constitute a series of intentional, knowing, and malicious acts that would justify the award of punitive damages.

Thus, with respect to cases involving a breach of duty "springing from a relation

of trust or confidence," New York courts hold that "a jury may consider whether the defendant's degree of moral culpability warrants the assessment of punitive damages." Green v. Leibowitz, 118 A.D.2d 756, 758, 500 N.Y.S.2d 146, 149 (2d Dep't 1986). Accord Schubert v. Marwell, 218 A.D.2d 693, 694, 630 N.Y.S.2d 547, 548 (2d Dep't 1995) ("In light of the claims of the existence of a fiduciary duty and a breach of that duty, the demand for punitive damages was not improper as a matter of law, and it was proper not to strike it at this time."); Stein v. McDowell, 74 A.D.3d 1323, 905 N.Y.S.2d 242, 245 (2d Dep't 2010) (upholding claim for punitive damages based on breach of fiduciary duty where defendant usurped coshareholder's ownership interest).

Directly on point is the case of Giblin v. Murphy, where the Court of Appeals held that a company may seek to recover punitive damages on the grounds that the board of directors of the company failed to protect the ownership interests of its stockholders by "failing to notify them of certain corporate action and by repeated wrongful diversion of corporate assets to themselves and others." Id., 73 N.Y.2d 769, 771, 536 N.Y.S.2d 54, 56, 532 N.E.2d 1282, 1284 (1988).

Defendants argue that proof of public harm is required to prove a punitive claim for breach of fiduciary duty. However, recent decisions have decisively held that public harm does not have to be shown in punitive claims for breach of fiduciary duty. Don Buchwald & Associates, Inc. v. Rich, 281 A.D.2d 329, 723 N.Y.S.2d 8 (1st Dep't 2001) (explaining that the public harm requirement applies only to breach of contract cases, not to tort cases for breach of fiduciary duty); Sherry Associates v. Sherry-Netherland, Inc.,

273 A.D.2d 14, 15, 708 N.Y.S.2d 105, 106 (1st Dep't 2000) ("The requirement for an award of punitive damages, that a defendant's conduct must be directed at the public generally applies only in breach of contract cases, not in tort cases for breach of fiduciary duty.") (citations omitted).

Similarly, with respect to claims for tortious interference with business relationships, a claim for punitive damages is typically valid.  See Serota v. Mayfair Super Markets, Inc., 15 A.D.3d 385, 790 N.Y.S.2d 173 (2d Dep't 2005); Catinella v. Mel Weitz Supermarkets, Inc, 286 A.D.2d 361, 362, 728 N.Y.S.2d 721, 722–23 (2d Dep't 2001) ("[P]plaintiff's request for punitive damages cannot be precluded as a matter of law, because the alleged improper malicious motive … is both a necessary element in the cause of action to recover damages for tortious interference, and a reason for awarding punitive damages.") (citations omitted).

For all these reasons, the claims for punitive damages is valid.

## II.   Defendants' request for Stay Must be Denied.

One form of protective order authorized by Fed. R. Civ. P. 26(c) is a partial or total stay of the proceedings. Discovery may be stayed pending determination of a dispositive motion,1 such as a motion to dismiss or a motion for summary judgment2 or a jurisdictional motion,3 at least until the plaintiff files an amended complaint stating a viable claim.4 In determining whether to stay discovery during the pendency of a dispositive motion, the court will generally look to three factors: (1) breadth of the discovery sought, (2) any prejudice that would result, and (3) the strength of the motion.  Given this stan-

dard , a discovery stay is entirely inappropriate.

WHEREFORE, Plaintiff prays that the court deny Defendants motion to dismiss and for stay.

Dated:          New York, New York
                January 27, 2012

_____
Joseph P. Leon, Esq. (JL-6049)

The Law Offices of Joseph Leon, PLLC
33 West 19th Street, Fourth Floor
New York, New York 10011
(917) 607-6915
joeleon@gmail.com

*Attorneys for Plaintiff*

-and-

S. George Alfonso
The Law Offices of S. George Alfonso
5340 Alpha Road
Dallas, Texas 75240
(972) 458-6800
geoalfo@aol.com

*Attorneys for Plaintiff*