UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X

HILTON HEAD HOLDINGS b.v.,
Derivatively and on behalf of Art Capital
Group, Inc.,

               Plaintiff,

          -v-

IAN PECK, ART CAPITAL GROUP, INC., FINE
ART FINANCE LLC, ART CAPITAL GROUP,
LLC, ACG CREDIT COMPANY, LLC, ACG
FINANCE COMPANY, LLC; ACG CREDIT
COMPANY II, LLC, ACG CREDIT COMPANY
III, LLC, ACG FINANCE COMPANY III, LLC,
AMERICAN PHOTOGRAPHY LLC, and other
unknown affiliated business organizations,

             Defendants.

--------------------------------------------------------------------X

11 Civ. 7768 (KBF)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: NOV 2 0 2012

KATHERINE B. FORREST, District Judge:

    This is one of those none too rare cases in which neither side has a position

that clearly places it "in the right". It is a case in which a loosely made investment

on one side was accompanied by loosely followed adherence to corporate formalities

on the other. The result was litigation which cost each side money, energy and the

stress of trial. The result is, as set forth below, one that attempts to recognize the

responsibility both sides share.

    In 2001, Hilton Head Holdings, b.v. ("Hilton Head"), a Netherlands company,

acquired 41,667 shares of Art Capital Group, Inc. ("ACGI") for $250,002. (Defs.' Ex.

16.) Pursuant to that transaction, Hilton Head became a holder of 0.87% of ACGI, a

company which, at that time, had a limited business scope of museum and collector related exhibition services. (Id.; Defs.' Ex. 14.)

Ian Peck, ACGI's founder, president and sole officer, has at all times retained a controlling 82% interest in ACGI. (Transcript of Trial ("Tr.") at 400, <u>Hilton Head Holdings b.v. v. Peck, et al.</u>, No. 11 Civ. 7768 (S.D.N.Y. Aug. 28-29, 2012), ECF Nos. 99, 101.) Peck is active in many areas of the art world – and is perhaps best known for his involvement in, and litigation surrounding, a loan to photographer Annie Leibovitz for over $20 million, secured by numerous photographic works. This story – with Hilton Head as a main character – commenced long before the Leibovitz loan. That loan, however, ends up playing a role in this drama as well.

Despite the substantial amount of Hilton Head's investment and the prior business experience of Hilton Head's representative, Hilton Head made its investment in ACGI with virtually no due diligence. Indeed, as described in more detail below, only two short documents were exchanged between the Hilton Head representative and ACGI's principal, Peck, prior to its investment. The subscription agreement, pursuant to which Hilton Head acquired its shares, was signed by its principal on the recommendation of her representative; this document contained no protective provisions for accountings, no shareholder meeting requirements, no vetoes or information rights with respect to certain transactions, and no provisions for distributions or repurchase of shares. Hilton Head made a quintessential illiquid investment.

Had Peck carefully observed corporate formalities with respect to ACGI, and as between ACGI and his other companies, this story would be a short one. Peck did not. ACGI continues to exist, Peck has used ACGI for various purposes relating to his wholly-owned companies for over a decade, and throughout this period he has owed fiduciary duties to ACGI's shareholders.

The evidence at trial was clear that Peck's assertions that the original business of ACGI was not viable were true and that he instead pursued the businesses of his other ventures. But Peck never formally dissolved ACGI. Rather, ACGI played various roles in Peck's new pursuits. Over the years, ACGI's operations mutated into those of a service company to Peck's wholly-owned companies. It had assets, personnel, facilities and the fees it was paid to manage the other companies' businesses.

Peck formalized this arrangement when he entered into a management services agreement ("MSA") between ACGI and his other companies. Under the MSA, Peck ran corporate operations of the other entities out of ACGI in order, at least in part, to utilize ACGI's accumulated net operating losses ("NOL's"). There was also testimony at trial that the "Art Capital Group" name was recognized and that name recognition was helpful to Peck's companies. In addition, ACGI employed personnel assigned to perform the core work for the other entities (including all aspects of arranging, negotiating and servicing dozens of collateralized loans). There was no distinction between personnel working on tasks for one company versus another: they shared the same physical office space,

telephone numbers, and also shared certain same bank accounts. Substantial sums of cash went into and out of various bank accounts owned by ACGI – monies that Peck asserts relate solely to the businesses of his other companies, yet there is no evidence as to what belongs to which company or even a basis upon which one could begin to figure that out. ACGI's tax returns paint a picture of a company that was continuously operating as late as 2010 – generating revenue, paying rent, employing personnel, amortizing office equipment, etc.

Peck himself may have deemed the original business of ACGI to be functionally "insolvent" – but he did not formalize that insolvency or treat ACGI as insolvent. Nothing in the record supports the picture defendants asserted of a moribund ACGI. Indeed, when convenient, ACGI was apparently financially able to take advantage of new corporate opportunities; sometimes these opportunities were presented to ACGI and at other times they were given to Peck's other wholly-owned companies. The proof is in the pudding: ACGI was never dissolved and the pudding continued to be served and eaten. Accordingly, Peck had a continuing fiduciary duty to present business opportunities that were within the foreseeable scope of ACGI's lines of business – including those lines of business as they expanded over the decade.

As to recovery, Peck—in his personal capacity—and the defendant companies are all liable. The Peck companies became or always were (it matters not which) a corporate melting pot – a stew of different companies, controlled and dominated by one man, none of which respected the formal differences between their operations

that would have entitled Peck or his companies to take best advantage of the insulations of corporate form.  In and of itself, this would normally be a problem only for Peck himself – all but one of these companies were his alone.  But it is ACGI that creates an issue: ACGI's outside shareholders were and continue to be entitled to Peck's compliance with his fiduciary obligations to ACGI; his actions have exposed himself and his companies to a piercing of the corporate veil by virtue of the shareholders' continued interest in ACGI.

Hilton Head's derivative action for breach of fiduciary duty as to Peck succeeds at a basic level: the Court finds that the appropriate remedy in this particular situation is to award plaintiff the amount of its original investment in exchange for relinquishment of its shares in ACGI – not more, not less.  The Court specifically declines to award costs, attorneys' fees or interest; the Court does, however, require that the $50,000 held in escrow pending the outcome of this litigation be returned in full and with any interest accrued on those funds, to Hilton Head.

FINDINGS OF FACT

A. <u>The Trial and Witnesses</u>

The Court held a two day bench trial on August 28 and 29, 2012.  At that trial, Andrew Rose, a former employee with one of Peck's companies (it was never entirely clear which one) testified, as did Karla Hoff, Hilton Head's President, Diederick van Eck, Hoff's husband and the representative of Hilton Head who discussed and arranged its original investment in ACGI, and Peck.

5

1. Andrew Rose

The Court found Rose's testimony generally unhelpful. He was apparently called to testify that ACGI's business included a broader array of financial services than defendants acknowledge. However, plaintiff's counsel never clearly established on direct or through any evidence (e.g., even a pay stub) by which of the various Peck companies he was employed – and Rose himself was equivocal on this topic (as was Peck). This raised questions as to which company the work he did and the business ventures he participated in could be attributed.

The Court was also troubled by the fact that Rose ultimately has a classic "ax to grind" with respect to Peck. Rose testified that Peck fired him after less than two years on the job, and that Peck has sued him for theft of corporate opportunities. (Tr. at 63-64.) In addition, he has been the subject of litigation from a former employer, Christie's, that raised serious claims. (Tr. at 102.) Taken together, the Court was unable to credit his testimony as to what business ACGI was in and whether his statements regarding profitability had to do with ACGI or some other Peck company. However, as set forth below, certain documentary evidence referring to Rose's work for "Art Capital Group" is helpful to the Court in understanding the melting pot of Peck companies.

2. Karla Hoff

Hoff was a sincere and credible witness. Unfortunately, she candidly admitted that her husband, van Eck, performed all the due diligence and business analysis on the decision of whether to acquire an interest in ACGI. (Tr. at 112, 115,

117, 121-22.)  Her communications with Peck were limited and of what is best
characterized as a social nature.  As a result, Hoff did not provide information
useful to determining liability.

    3.  <u>Diederick van Eck</u>

    Van Eck was a credible and sincere witness.  He had more than two decades
of experience in the financial services industry before he began his work with Hilton
Head. (Tr. 125-26.)  However, his testimony was clear that despite his experience,
he performed virtually no due diligence into ACGI prior to investing a quarter of a
million dollars, and he recommended that the principal of Hilton Head enter into an
agreement that contained no provisions requiring shareholder rights of disclosure,
distribution, accounting, or buyout.  (Tr. at 166-68.) Van Eck testified credibly that
he trusted Peck – and that he assumed that Peck would do the right thing. (Tr.
179.) A sophisticated business person such as van Eck should have required more.

    4.  <u>Ian Peck</u>

    The Court found Peck to be a sophisticated businessman who was at times
less than forthcoming in his testimony.  He answered carefully those questions
directly posed but at times obviously skirted the question to avoid an awkward
answer.  The Court cannot point to a purposeful lie – but nor was he forthcoming.
There were certainly times when his testimony was not credible.

    Peck's testimony confirmed that even he could not distinguish between
what one entity did and what another did at various times.  He was less than clear
as to how to draw lines within what he referred to generically as "Art Capital

Group" (which could be an "LLC" of which he is the sole member or ACGI, which had outside shareholders). He agreed the name "Art Capital Group" was used "generally" to refer to a variety of his businesses. (Tr. at 292, 317, 319.) The Court found that Peck was not credible when he avoided clarity on questions of financial divisions between the companies and the financial position of ACGI, including the information on ACGI's tax returns (which show substantial activities and revenues even in recent years).

B. The Documentary Evidence

The Court has relied primarily upon the documentary evidence combined with the relevant live testimony to decipher what happened when and with whom. The documentary evidence consists of the original subscription agreement signed by Hilton Head (Defs.' Ex. 16), the "Executive Summary" (Defs.' Ex. 14; Pl.'s Ex. 3) and "one pager" (Defs.' Ex. 13) describing the ACGI business that Hilton Head received prior to its investment, ACGI's tax returns (Defs.' Ex. 21, Pl.'s Exs. 4, 5, 6, 17, 18, 19, 20), the MSA between ACGI and Peck's other companies (Pl.'s Ex. 7), complaints relating to two lawsuits in which ACGI is a named party (relating to Rose, Pl.'s Ex. 9, and Annie Leibovitz, to whom a loan was extended, Pl.'s Ex. 10), a settlement agreement regarding the Leibovitz lawsuit to which ACGI is a party (Pl.'s Ex. 22), and other materials in which the name ACG is used indistinguishably as between ACGI and the other Peck companies (for instance, Pl.'s Ex. 11).

The Court also relies on documents from various of the Peck companies, including ACGI, ACG LLC and American Photography Group LLC, which show

8

that they all shared the same address, telephone and fax numbers. (See, e.g., Pl.'s

Exs. 26, 27.)

C. Hilton Head's Investment

In 1999, Peck started a company called FineArtLease.com, Inc. ("FAL"). FAL

was in the business of leasing and arranging museum exhibits. In February 2001,

FAL changed its name to Art Capital Group, Inc. ("ACGI").  In mid-2001, van Eck,

a representative of Hilton Head, communicated with Peck regarding a potential

investment in ACGI. In connection with this investment, he received a one-page

information sheet and an "Executive Summary" that described ACGI's business and

plans.  (Pl.'s Ex. 3, Defs.' Exs. 13, 14).

The one-pager (Defs.' Ex. 13) is entitled "Art Capital Group" (there is no

reference to "Inc."), and states "The Company: Art Capital Group ('ACG' or the

'Company') is a financial services company specializing in the fine art sector."  It

also states that ACG's business is "museum-to-museum Exhibition Services that

enable museums (and foundations, trusts or private collectors) to turn their

collections into cash-generating assets . . . . Corporate leasing services extend this

option to corporations, creating a much-needed supplemental source of income for

the lessors . . ."  Under "Strategy", the one-pager states "ACG is positioned to grow

its activities with minimal risk. While the businesses complement each other, each

is profitable separately . . . Revenues from [museum to museum exhibition services]

are forecast to grow from $2.6M in year 1 to $29 million in year 4."

The Executive Summary (Defs.' Ex. 14) is also entitled "Art Capital Group" (without the "Inc."). It similarly describes ACGs existing businesses to include "Museum Exhibition Services" and "Museum Leasing Services". The third line of business, which had not yet been launched, was referred to as "Merchant Services."

The Executive Summary describes the existing Museum Exhibition Services as enabling:

> owners of art (museums, foundations and private art collectors) to turn their archived or previously displayed art work into cash-generating assets, while simultaneously creating opportunities for borrowing institutions (other museums, foundations, or public institutions) to increase their own revenue through heightened attendance and merchandising. Through [Museum Exhibition Services, ACG, Inc.] offers art owners a turnkey program that includes identifying and securing appropriate venues, managing contract negotiations, arranging for transportation and insurance, handling logistics, and overseeing the production catalogues and other related merchandise – in return for fees paid by the borrowers of the art work. (Id.)

The Executive Summary describes the Museum Leasing Services line of business as follows:

> The Company also offers Museum Leasing Services that make it possible for corporations to lease art collections and single works from museums, private collections, estates and galleries, thereby creating a much needed supplemental source of income for the lessors and an annuity-type revenue stream for [ACG, Inc.] Structured as back-to-back operating leases, these transactions also create a tax deduction for corporations. (Id.)

The Executive Summary also lists as a "strategic advantage" the fact that "[t]he Company's Chief Executive Officer, Ian Peck, as well as ACG's predecessor company, Fine Art Lease, has attracted significant publicity . . . . The Company's Chief Financial Officer, Mark Peskin, has more than 25 years of experience in structuring financial transactions." The same document also has a section referring

to its expansion efforts to become "'The' Financial Services Company for the Art World." (Id. at 5). The testimony from van Eck is consistent with the other record evidence that at the time of Hilton Head's investment, the Museum Exhibition and Museum Leasing Services were ACGI's core lines of business, with some potential expansion opportunities. (Tr. at 150-58.)

The Executive Summary describes a proposed line of business as a new "Merchant Services Division." This was described as providing "art merchants" – defined as "an individual or organization that acts as a principal or intermediary between potential sellers and buyers of art, including galleries, auction houses, art and design professionals . . . and private dealers" – with the ability to offer credit to potential art purchasers at the point of sale. There is no dispute that this line of business was never launched. According to the Executive Summary, this Merchant Services business would assist exclusively in the:

> financing of fine art work. This arrangement will make it possible for collectors to purchase a greater number of works or more [v]aluable art . . . . [ACG, Inc.] is in discussions with a number of global financial services companies to provide the required credit facilities. Management anticipates launching this program within six months after it receives the initial funding. (Defs.' Ex. 14.)

There is nothing in the Executive Summary which indicates that the Merchant Services Division intended to lend to borrowers directly. Indeed, the Executive Summary is clear that the program would only launch after it had received initial funding from a financial services company. If it launched its Merchant Services, the role of the company was to be limited to qualifying merchants for the program, training and supporting the merchants, securing credit

11

information and performing an initial review of that information, and arranging for an appraisal of the artwork.  The Executive Summary described the financial institution as having the responsibility for credit approval, payment invoicing and collections as well as repossession in the event of default (though ACGI would undertake the sale process to obtain the best price).

Van Eck testified credibly that he recommended that Hilton Head invest in ACGI based on the one page information sheet and the Executive Summary, and that he did not have any other express agreements with Peck regarding any additional lines of business. (Tr. at 158, 166-68)

On June 19, 2001, Hilton Head's Hoff signed the Subscription Agreement for ACGI shares. (Defs.' Ex. 16).  That Agreement states that the "Subscriber is acquiring the Shares, as principal, for the Subscriber's own account for investment purposes only. . . . The Subscriber has no present intention of selling or otherwise distributing or disposing of the Shares, and understands that an investment in the Shares must be considered a long-term illiquid investment." (Id. § 2(a).)

The Agreement also states:

> The Subscriber recognizes that an investment in the Shares involves significant risks, which risks could give rise to the loss of the Subscriber's entire investment in such securities. The Subscriber acknowledges that the Subscription Agreement is not intended to set forth all of the information which might be deemed pertinent by an investor who is considering an investment in the Shares. It being the responsibility of each such investor (i) to determine what additional information such investor desires to obtain in evaluating this investment and (ii) to obtain such information from the Company." (Id. § 2(b).)

Finally, the agreement represents, "Subscriber has had full access to all the information which the Subscriber (or the Subscriber's advisor) considers necessary or appropriate to make an informed decision with respect to the Subscriber's investment in the Shares," (Id. § 2(d)),  and, "Subscriber acknowledges that there will be no market for the Shares and that the Subscriber may not be able to sell or dispose of them. . . . [T]he Subscriber is able to bear the risk of illiquidity and the risk of complete loss of the investment."  (Id. § 2(g).)

In 2002, ACGI sought additional funding. It sent Hilton Head (via Hoff) a letter setting forth the terms of the potential additional investment opportunity. (Defs.' Ex. 19.) Hoff testified that she does not recall seeing this request but did not deny that she had; she testified that she left these matters to van Eck. (Tr. at 117-18.)  In turn, van Eck testified that Hilton Head was not interested at that time in an additional investment in ACGI. (Tr. at 173-75.)

In 2003, Peck established Art Capital Group LLC ("LLC") and became its sole member. (Tr. at 457-58.)  LLC became the umbrella company under which several of the special purpose vehicles that financed collateralized art loans would later be organized.  (Tr. at 461.)  There was no testimony in the record regarding any value of the "Art Capital Group" name or any formal or informal arrangement between ACG LLC and ACGI for ACG LLC to use the name.  Chronologically, there is no dispute that the ACGI entity came into existence first.

D. <u>The Financial Evidence Relating to ACGI's Operations</u>

Peck testified credibly that ACGI was not profitable for the years 2000-03. (Tr. 359-62.) This is corroborated by ACGI's tax return for 2000 which shows a loss of $1,678,665 but assets of $812,224; the return for 2001 shows a loss of $1,157,548 but assets of $617,746, the return for 2002 shows a loss of $1,088,988 but assets of $1,163,199, and the return for 2003 shows a loss of $224,867 but assets of $1,513,230. (Pl.'s Ex. 21.)  The poor financial condition of ACGI is also corroborated by Rose's testimony that when he joined ACG LLC or ACGI (he was unclear which as was Peck), he understood that ACGI was in financial difficulties. (Tr. at 65.) Moreover, there is uncontroverted evidence in the record that from 2004 to 2010, ACGI utilized the net operating losses ("NOLs") carried over from these prior periods. (Tr. at 213.)

Peck testified that he deemed ACGI to be functionally "insolvent" as of some time in 2002-03. (Tr. at 299)  He also testified that over time he lent money to ACGI for which he was never repaid. (Tr. at 413-14.)  This latter testimony is inconsistent with ACGI's tax returns which do not show loans carried from year to year, and instead show loans being made to and repaid by ACGI in 2004 and later years, and substantial income for ACGI in those years. (See Pl.'s Ex. 4.)

For instance, the 2004 tax return shows a loan due to unnamed shareholders of $929,814 at the beginning of the year, and none remaining at the end.  Notably, for 2004 ACGI reported revenue of $1,935,006 and gross profit in the same amount,

assets of $835,682, but taxable income of $0. (Pl.'s Ex. 4.) In 2005, ACGI shows

revenues of $7,650,149 less $5,168,165 cost of goods sold, a profit of $2,481,984 and

assets of $1,086,468 – but a taxable income of $0. (Pl.'s Ex.5.)   In 2006, ACGI shows

revenues of $6,647,320 less $3,550,000 cost of goods sold, a profit of $3,097,320,

assets of $5,428,316, but a taxable income of $0.  (Pl.'s Ex. 17.)  In 2006, there are

no loans shown to shareholders at the beginning or end of the year. (Id.) The tax

return for ACGI for 2007 sets forth revenues of $2,082,190, less $89,000 cost of

goods sold, a profit of $1,993,190, assets of $15,006,613, but a taxable income of

(negative) <$377,723>.  (Pl.'s Ex. 18.) In 2006, there are "loans from shareholders"

in the amount of $14,490,000, while other assets are $14,875,752.   These are listed

on "Statement 5" of the return as notes receivable of $14,134,561 but notes

receivable from related parties of only $664,013.[1]  (Pl.'s Ex. 18.)

The mystery deepens in 2008: ACGI shows revenues of $3,514,828 with no

cost of goods sold, leaving a profit of $3,514,828, assets of $15,621,731, and a

taxable income of $0.  (Pl.'s Ex. 19.) Statement 6 to that return lists the assets as

$15,408,275 in notes receivable with $0 due from related parties. (Id.) The return

also shows an opening balance of $14,490,000 as loans from shareholders but a

closing balance of $12,149,614. (Id.)  In 2009, ACGI's tax return states revenues of

$3,200,560, less cost of goods sold of $338,863, profits of $2,861,697, assets of

$21,206,987, and a taxable income of $0. (Pl.'s Ex. 20.) Loans from shareholders are

shown at the beginning of the year as $12,149,614 and at the end of the year as

---

[1] For each of the years, 2001, 2002, 2003, and 2006, the ACGI tax returns state that Peck devoted 100% of his time to the business of ACGI.

$12,076,614. (Id.) Statement 5 lists the assets as derived from $15,106,887 as notes receivable and $5,862,443 as notes receivable from related parties. (Id.)

Peck's personal returns for 2006-2009 do not evidence personal loans to ACGI or notes receivable due to or from ACGI. (Pl.'s Exs. 12-15.)  The tax returns for Art Capital Group LLC (which list the same address as ACGI) show substantial income in the millions of dollars for the years 2006 (Pl.'s Ex. 12), 2007 (Pl.'s Ex. 13), 2008 (Pl.'s Ex. 14), and 2009 (Pl.'s Ex. 15).

Plaintiff did not offer any testimony – or even try to elicit much on cross-examination – that would explain the revenues and assets on the various tax returns.  The documentary evidence must therefore speak for itself – and it clearly indicates that ACGI was a company that had ongoing operations generating millions of dollars in revenues up through 2009; it also had substantial assets throughout that period as well.  Defendants did not present any evidence to explain what those assets were or how to reconcile the millions of dollars of revenue with a company which had been described as functionally "insolvent" and as if it existed on paper only.  (Tr. at 419.) The documentary evidence is not supportive of such a story.

For tactical reasons known only unto itself, plaintiff introduced an ex-post profit and loss statement prepared by defendants during the course of the litigation for both ACGI and Art Capital Group LLC. (Pl.'s Ex. 1-A.)  No clear explanation was ever provided as to the basis of this document, how it reconciles with the

information on the tax returns, and what it was supposed to demonstrate. The Court did not find it useful to determining any issue in this matter.

It is important to note that at the close of the trial, the Court asked for additional briefing specifically addressing, inter alia, the tax returns and how to reconcile the activity on the ACGI tax returns with the picture of a company that had been portrayed as essentially out of business. (Tr. at 488). The post-trial submissions were silent on this point. (See Dkt. Nos. 102, 103.)

Finally, defendants introduced the Consolidated Financial Statements of Art Capital Group LLC for the years 2005-2009. (Defs.' Exs. 39-43) Of interest in these financial statements is that they consolidate the finances of the following Peck companies: Art Capital Group LLC, ACG Credit Company, ACG Credit Company II, ACG Galleries, Fine Art Finance, APF Advisors and Art Performance Fund. (Id. at n.1.) The same note states that "the Company operates in a specialized financing industry providing asset based loans collateralized by fine artworks and real estate investments. The Company also provides financial and consulting services to assist art owners in creating liquidity from art assets." (Defs.' Ex. 39 at ACG-HHH002346.)

None of the Consolidated Financial Statements sheds any light on the notes due set forth on ACGI's tax returns. Records subpoenaed from JP Morgan relating to accounts held in the name of ACGI reflect significant banking activity in 2006. (Pl.'s Ex. 26.) Account statements for another of Peck's companies, Stubbs Holdings LLC, reflect numerous wire transfers of funds from ACGI to Stubbs. (See, e.g., Pl.'s

Ex. 28, at entries for Nov. 16, 22, 30, 2006.) Similarly, account statements from Peck's Fine Paintings Ltd. reflect a number of significant wire transfers of funds from ACGI to Fine Paintings Ltd. (Pl.'s Ex. 27, at entries for Feb. 15, 17, May 4, 5, 11 and 25, 2006; Id. at entry for July 21, 2006 (for $2 million)). None of these wire transfers were explained at trial.

Peck testified that he told the shareholders, including Hilton Head, that ACGI was functionally insolvent and that he had lent it money. (Tr. at 299-304, 413-15.) The Court did not find this testimony credible. Peck's testimony was also directly contradicted by the far more credible testimony of van Eck and Hoff who stated that in the few conversations they had with Peck subsequent to Hilton Head's investment, he never mentioned any financial difficulties. (Tr. at 114, 115, 136.)

### E. What We Do Know About ACGI's Business Activities

From the facts as set forth in the one-pager, the Executive Summary, and the testimony as outlined above, the evidentiary record supports the Court's finding that at the time of Hilton Head's share acquisition, its business was limited to museum related exhibition services and related corporate and collection leasing services. It also supports the finding that ACGI hoped to expand into other lines of business and become "'The' Financial Services Company for the Art World". (Defs.' Ex. 14.) Exactly what that meant at the time – and whether that changed over time – goes to the heart of plaintiff's claims.

The evidentiary record, and Peck's testimony, demonstrates that ACGI had the capability and did in fact act as an "arranger" on several collateralized loans (secured by artwork).  For instance, in 2002, ACGI acted as the "arranger", or middleman and servicer but not lender, on two transactions:  the first related to a single painting by C.M. Russell ('Watching the Settlers"), and the second relating to a collection of American furniture (the "Gill Loan"). (Tr. at 332.) Peck testified that these were "one off" situations that essentially fell in the lap of ACGI but that ACGI was not "in the business" of dong such transactions in general.  (Tr. at 425-28.) ACGI received commissions in its role as arranger in these transactions. (Tr. at 293.) Of course, once having engaged successfully in such business – as it did – it had expanded its overall lines of business and therefore was in the "business" of acting as an arranger.

In 2003, Peck prepared and distributed materials relating to a new venture called "Art Performance Fund, L.P." (referred to as "APF"). (Defs.' Ex. 26.)  APF was attempting to raise money to engage in asset based lending.  As part of its investor presentation materials, APF stated that "ACG's principals have successfully acted as value added partners to investors, art owners, and dealers for many years, building solid track records of transactions <u>identical</u> to those that the Fund intends to pursue." (<u>Id.</u> at 16 (emphasis added).)  Among the transactions listed on that page are two in which <u>ACGI</u> had acted as lender and arranger: the C.M. Russell painting loan, and the American Furniture (Gill) loan. (<u>Id.</u>) These two transactions are listed as "secured lending" transactions. Pages 17 and 18 of the same

19

presentation list additional details regarding these two transactions as "case studies" for APF. Among the members of APF's "management team" listed in the presentation are "Krecke", current "CFO/COO of Art Capital Group, Inc." (Id. at 23) and "Ian Peck, Managing Partner, Founder and Current CEO of Art Capital Group, Inc., with unique experience combination of fine art expertise and creative finance experience." (Id. at 21.) APF is listed as having the same address and phone number as ACGI. (See, e.g., Pl.'s Ex. 24 at 00393.) APF was therefore attempting to enter into ACGI's existing lines of business.

The evidence at trial demonstrated that ACGI acted as arranger on only three of the dozens of loans in which Peck's companies participated in any way. Defs.' Exs. 48, 50, 51; Tr. 332, 451.) ACGI did act as the arranger of the largest of all of the collateralized loans, the loan to Annie Leibovitz. (Defs.' Ex. 48; Tr. 301.)  In none of these transactions did ACGI act as the lender itself. (See Defs.' Ex. 48.)

Peck testified that ACGI could not have been the lender because it did not have the assets to support that activity; and that lenders would also not allow ACGI to act as arranger due to its financial position. (Tr. 461-62.)  Plaintiff did not present evidence from any lender to the contrary.

F.  The Management Services Agreement

According to Peck, following the functional insolvency of ACGI, he was advised by his accountant to enter into a Management Services Agreement ("MSA") between ACGI and his other companies, pursuant to which ACGI would perform services needed by these other companies. The MSA was put into place on August

14, 2003. (Pl.'s Ex. 7) and operative until 2011 when any remaining ACGI NOLs

expired. (Tr. at 418.)

Among the services ACGI provided under the MSA were:

(a) providing general business advice, including recommendations as to, and identification of, potential lending opportunities;

(b) conducting due diligence with potential lending opportunities;

(c) negotiating lending transactions;

(d) identifying, structuring,, negotiating, obtaining bank, institutional and other sources of funding necessary or appropriate in connection with any proposed lending transaction;

(e) supervising the preparation and review of all documents required to complete a proposed lending transaction;

(f) monitoring and servicing made by the ACG entities;

(g) providing management and financial planning, including advice on the utilization of assets;

(h) furnishing data processing services, telephone services and telecopy services, office space and utilities, computer services, clerical services, executive and administrative services, stationary and other office supplies and other general purpose office equipment;

(i) providing accounting and bookkeeping;

(j) opening, maintaining and closing bank accounts and drawing checks or other orders for the payment of monies, in each case on behalf of the ACG Entities; and

(k) providing such assistance to the ACG Entities and their counsel and auditors as generally may be required to properly carry on the business and operations of the ACG Entities. (Id.)

Plaintiff did not put forward any evidence to suggest that the MSA was not a

commercially reasonable agreement.  Defendants did not put forward any evidence

that the MSA was not implemented and utilized as set forth in the agreement. Peck

testified that the MSA was designed to allow his other companies to use ACGI's

accrued NOL's. (Tr. 350.) The Court has no reason to doubt that this reason played

a role in entering into the MSA.  Nevertheless, the MSA is significant evidence of

the existence of ACGI's skills and capabilities to engage in precisely those

businesses in which Peck's other companies were engaged.

    G. <u>Other Uses Of ACGI</u>

    Additional evidence at trial further corroborated that ACGI continued as an

active, operating entity well past 2002-03 (when Peck stated it was functionally

"insolvent").  For instance, in 2007, ACGI obtained a trademark for the name "Art

Capital Group". The trademark application, which was not introduced into evidence

but of which the Court takes judicial notice, states that the businesses of ACGI are

1) "[r]etail store and on-line retail store services featuring art catalogs, posters, and

souvenirs offered in connection with art exhibits," 2) "[f]inancial services, namely,

arranging for the financing for leasing of art collections, arranging for corporate and

foundation sponsorship of art exhibitions, brokerage of art collections available for

exhibition; brokerage of art from museums, estates, corporations, organizations and

private individuals to museums, estates, corporations, organizations and private

individuals," and 3) "[c]reating exhibitions by gathering art works from museums,

estates, corporations and private individuals and organizing them into exhibitions;

leasing works of art from museums, estates, corporations, organizations and private

individuals to museums, estates, corporations, organizations and private

individuals." ART CAPITAL GROUP, Reg. No. 3190377.

As stated above, in 2009, ACGI acted for the third and final time as an

arranger on a collateralized loan. (Defs.' Ex. 48.) This loan was related to a loan

secured against the photographic works of Annie Liebovitz. (Id.) The 2009 loan was

made by a subsidiary of ACG LLC set up specifically for this purpose, called

American Photography LLC.  (Tr. at 454.) An initial $5 million facility was made

available pursuant to this arrangement; subsequently, Goldman Sachs entered the

arrangement and eventually a credit facility totaling $24 million was extended to

Leibovitz. (Id.) All of these funds were secured against Leibovitz photographs.

(Defs.' Ex. 48.)  At some point, ACGI sued Leibovitz for breach. (Pl.'s Ex. 10.) ACGI

was the sole named plaintiff. (Id.) Notably, the litigation states that "Leibovitz

approached Plaintiff [ACGI], a well-known and experienced consultant and advisor

to artists and art owners. . . . Leibovitz initially obtained a $22 million secured

credit facility from Plaintiff's affiliate, American Photography, LLC." (Pl.'s Ex. 10

¶1.)  The Complaint also refers to ACGI and American Photography's business in

the following manner:

> Plaintiff and its affiliate, American Photography, provide financial and
> consulting services to artists and art owners, providing liquidity to individual
> artists, owners and art galleries from their intellectual property and fine art
> assets.  Among other services, Plaintiff and its affiliate offer recourse and
> non-recourse asset-based loans to artists, individuals, galleries and other
> businesses utilizing their intellectual property and art assets as the collateral
> securing the loan or as a component of the collateral package.  Plaintiff also
> engages in art sales, art purchases and art advisory services." (Id. ¶ 15.)

Litigation between the parties to the loan resulted in a settlement. The monies paid as part of the settlement went first to repay the original lenders. (Tr. at 456; Pl.'s Ex. 22.) Plaintiffs repeatedly referred to this settlement at trial as a "multi-million" dollar settlement – but that included loan principal. (Tr. at 307-08, 476.) No evidence was admitted at trial that clarified what amount of settlement funds, if any, was attributable to amounts exceeding principal repayment to the original lender or the payment of attorneys' fees.

In 2005, ACGI and a number of other Peck companies commenced a lawsuit against Andrew Rose. (Pl.'s Ex. 9.) The lawsuit alleges that the addresses for the places of business for ACGI and the other Peck companies were the same (Id. ¶¶ 3-6.) The complaint against Rose refers to ACGI as "Art Capital" and alleges that in 2003 "Art Capital and ACG Credit approached Rose to determine whether Rose would be interested in joining Art Capital and ACG Credit." (Id. ¶ 16.) It alleges further that "Rose accepted Art Capital and ACG Credit's offer and agreed to focus his attention on assisting Art Capital with developing banking relations, private art acquisitions and sales and strengthening ACG Credit's loan portfolio." (Id. ¶17.)

H.  Factual Conclusions

Together, the evidence demonstrates well beyond a preponderance that ACGI has been continuously engaged in business since Hilton Head acquired its shares.  It has been engaged in its original lines of business relating to museum and related exhibition services, and has expanded its lines of business to include other types of financial services.  There is overwhelming evidence that the businesses of

ACGI and the other Peck companies were intermingled. The intermingling went well beyond merely entering into an MSA – it was an intermingling of all aspects of conducting business.

The evidence is unclear as to what money and assets came from which source – and to which entity they properly belong. This only becomes of interest to this Court in the context of attempting to understand whether plaintiff's cause of action for breach of fiduciary duty has merit. The Court compares the facts to the legal standards as set forth below to determine the answer to this final and ultimate question.

## DISCUSSION

Plaintiff pursued the following causes of action in its Amended Complaint: 1) breach of fiduciary duty, including waste, conversion, and theft of business opportunity; 2) aiding and abetting breach of fiduciary duty; 3) civil conspiracy; and 4) alter ego liability against the defendant companies.

Despite pleading multiple theories of recovery, the parties presented this case at trial as coming down to breach of fiduciary duty primarily involving theft of ACGI's corporate opportunities. Specifically, the parties focused on the question of whether making collateralized loans or participating more actively as arranger of such loans was within ACGI's lines of business or was a foreseeable outgrowth of its lines of business at the time that Hilton Head made its acquisition of shares. If collateralized lending was in ACGI's line of business or was a foreseeable outgrowth, then Peck had a duty to present collateralized lending opportunities or

associated activities to ACGI and to allow ACGI to reject such opportunities before he could start a separate business venture in that line, unless ACGI was financially incapable of undertaking that business.  If, on the other hand, collateralized lending or associated activities were not within ACGI's actual or foreseeable lines of business, then Peck had no fiduciary duty to present the lending opportunities.

The Court discusses each of the causes of action in turn, focusing on theft of corporate opportunity since that is where plaintiff most clearly met its burden of proof.   Plaintiff effectively abandoned its aiding and abetting and civil conspiracy causes of action at trial, so the analysis of those claims merits briefer analysis.  As plaintiff has met its burden on the breach of fiduciary duty cause of action, the Court concludes with an analysis of the proper remedy – both as to whether piercing the corporate veil is appropriate and whether plaintiff is entitled to direct damages or the recovery must go to ACGI.

A.  <u>First Cause of Action: Breach of Fiduciary Duty</u>

The primary legal issue in this litigation is whether Peck breached fiduciary duties he owed to the shareholders of ACGI – and if so, how.  Did he divert corporate opportunities? Did he waste assets? Did he fail somehow to fulfill his obligation of candor?

The parties agree that the law of Delaware applies to the breach of fiduciary duty cause of action.[2]  Pursuant to Delaware law, a breach of fiduciary duty cause of action has two elements: (1) the existence of a fiduciary duty, and (2) a breach of

---

[2] This Court has subject matter jurisdiction by virtue of diversity.  New York law applies the internal affairs doctrine for breach of fiduciary duty causes of action – and thus applies the law of the state of incorporation to such causes of action.  There is no dispute that ACGI is a Delaware corporation.

that duty. See Estate of Eller v. Bartron, 31 A.3d 895, 897 (Del. 2011). There are

three types of duties a fiduciary owes to the shareholders of a corporation: a duty of

care, a duty of loyalty—the most relevant duty here—and a duty to act in good

faith. See Malone v. Brincat, 722 A.2d 5, 10 (Del. 1998). To overcome the normal

presumption that a director's business decisions are protected from ex post judicial

revision due to a breach of the duty of loyalty, the plaintiff shareholder "must

present evidence that the director either was on both sides of the transaction or

derive[d] any personal financial benefit from it in the sense of self-dealing, as

opposed to a benefit which devolves upon the corporation or all stockholders

generally." Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 363 (Del. 1993) decision

modified on reargument, 636 A.2d 956 (Del. 1994) (quotation omitted). Where a

director stands on both sides of a transaction, that director has "the burden of

establishing [the transaction's] entire fairness." Weinberger v. UOP, Inc., 457 A.2d

701, 710 (Del. 1983). The Amended Complaint asserts that Peck engaged in theft of

corporate opportunity, waste, and conversion that breached his fiduciary duties as a

director and controlling shareholder of ACGI.

   1. Theft of Corporate Opportunity

     i. Conclusions of Law

Delaware law does not allow a fiduciary of a corporation to take an

opportunity presented to the corporation and convert it into his own opportunity if

the corporation is financially able to undertake the opportunity, and by virtue of its

business, it has an interest or a reasonable expectancy in the opportunity. See

Guth v. Loft, Inc., 5 A.2d 503, 511 (Del. 1939).  A trier of fact must weigh the
evidence to determine whether a particular opportunity presented to a corporation
is within its line of business (and therefore that it can have a reasonable expectancy
of the opportunity) and whether it is financially capable of pursuing that
opportunity. Id. at 513.  A court must draw reasonable inferences from available
facts to determine whether the opportunity meets this test. See Beam ex re. Martha
Stewart Living Omnimedia, Inc. v. Stewart, 833 A.2d 961, 972 (Del. Ch. 2003), aff'd,
845 A.2d 1040 (Del. Ch. 2004).  "Where a corporation is engaged in a certain
business, and an opportunity is presented to it embracing an activity as to which it
has fundamental knowledge, practical experience and ability to pursue, which
logically and naturally, is adaptable to its business having regard for its financial
position, and is one consonant with its reasonable needs and aspirations for
expansion, it may properly be said that the opportunity is in the line of business."
Guth, 5 A.2d at 514; see also Stewart, 833 A.2d at 972-73.

 Under Delaware law, a fiduciary "does not breach his fiduciary duties if he
takes a corporate opportunity for himself once a corporation has properly rejected it
or established that it is not in a position to take it." See Field v. Allyn, 457 A.2d
1089, 1099 (Del. Ch. 1983), aff'd, 467 A.2d 1274 (Del. Ch. 1983).  The Delaware
Supreme Court has indicated that a variety of tests to determine whether a
corporation's financial difficulties rise to an excuse for the corporate opportunity
doctrine are legitimate, but it has not ruled squarely as to whether a showing of

actual insolvency is required.[3] <u>Yiannatsis v. Stephanis by Sterianou</u>, 653 A.2d 275, 281, 281 n.2 (Del. 1995)(declining to rule on "actual insolvency" standard but noting that courts judging theft of business opportunity claims have applied, among others, "a balancing standard, temporary insolvency standard, or practical insolvency standard").

### ii. Analysis

The evidence is clear that making collateralized loans was not in ACGI's lines of business at the time that Hilton Head made its acquisition of shares. The most that can be said is that it had demonstrated an ability and willingness to be an arranger (and therefore servicer) on two isolated transactions in 2002 (the C.M. Russell Painting and the American Furniture loans). These two transactions did expand ACGI's "lines of business." ACGI was capable of and did perform the required services. However, no evidence was presented at trial that in the 2002-03 timeframe ACGI presented itself to the world as an "arranger" of collateralized art loans, that it advertised in this area, or that it sought out potential customers in this area. Instead, it is clear that when Hilton Head made its investment, it was making an illiquid investment pre-9/11 into a business that was set up to facilitate monetizing art collections by leasing them from one set of collectors, exhibitors and museums to another. The intent as testified to at trial was that ACGI would use its

---

[3] Under Delaware law, actual insolvency occurs where 1) a company is "unable to pay its debts as they fall due in the usual course of business" or 2) "it has liabilities in excess of a reasonable market value of assets held." <u>See</u> <u>United States Bank Nat'l Ass'n v. United States Timberlands Klamath Falls, LLC</u>, 864 A.2d 930, 947-48 (Del. Ch. 2004), <u>vacated on other grounds</u>, 875 A.2d 632 (Del. June 6, 2005).

contacts and knowledge in the art world to do this and hoped to make some money both for itself and for its customers as it was doing so. This business failed.

In addition, there is no evidence in the record that any Peck company diverted any corporate opportunity relating to the existing Museum Exhibition or Services lines of business; nor is there any evidence in the record that the potential Merchant Services line of business failed to take off because of a diverted opportunity. Nothing in the record establishes that the Merchant Services business was a collateralized loan business.

There is evidence, however, that the collateralized loan business was a foreseeable outgrowth of ACGI's existing lines of business in two ways. First, plaintiff introduced an "Executive Summary" presentation given by Peck and his associates that suggested that ACGI "intends to turn art into a new asset class for financing," suggesting it would expand into lending businesses as part of its campaign to become "'The' financial services company" for the art world. (Pl.'s Ex. 3 at 3, 5.) Second, once ACGI became an arranger and servicer of the loans, the origination function became a foreseeable outgrowth of that business as well. Other of Peck's entities acted as both originator and arranger of certain loans and there was no direct evidence presented to show that ACGI could not have taken on the role of originator as well, other than for ACGI's lack of capital to collateralize the loans. (See Tr. at 461-462.) The lack of capital is not a conclusive, though; ACGI could have made alternative arrangements to get the collateral, such as by setting up a special purpose vehicle – just as Peck testified ACG LLC did in making

30

other loans by creating new SIV subsidiaries that were insulated from ACG LLC's liabilities. (Tr. at 432-433.) Defendants argued that the banks would not have consented to such an arrangement with ACGI because it had prior debts and multiple investors, but they presented no credible evidence to prove that such consent was withheld or that an SPV under ACGI as a parent company was not feasible. (Tr. at 461-62.) The Court therefore finds that participation in collateralized lending was a "logical[ ] and natural[ ]" outgrowth of ACGI's lines of business and thus meets the corporate opportunity test. Guth, 5 A.2d at 514.

Even if the evidence failed to satisfy the emerging lines of business test, though, the Court comes to the same conclusion based on an analysis of the MSA as regards the business ACGI actually did complete.

On the one hand, the MSA is clear on its face and in execution that, pursuant to its terms, ACGI was capable of and did in fact provide the very negotiating, lending, servicing and other services relating to collateralized loans that it performed for the other entities under the MSA. The evidence in the record supports by well more than a preponderance that as of the time the MSA was signed, the ACGI entity became the operating company for all of the business for the various Peck companies. ACGI's personnel were used to carry out the business of those companies – collateralized art lending. Its facilities were used, its bank accounts were used to move money in and out and all around, and its stationery, computer systems and support services were used by the companies as well. In return, it received a fee. The Court cannot ignore that the MSA was a legally

31

binding agreement and established that ACGI had the various capabilities it contracted to provide. It was therefore, in fact, able to do the very things that it did do, on behalf of each of the Peck entities. There is no evidence in the record that any tasks that led to the revenues associated with any of the Peck entities were performed by anyone other than individuals employed by ACGI pursuant to the MSA.

      2. Waste

Plaintiff sets out a second fiduciary duty theory based on waste of corporate assets. Ordinarily, corporate directors are protected by the "business judgment rule" by which a court will not second-guess corporate decisions made in good faith. Sample v. Morgan, 914 A.2d 647, 669 (Del. Ch. 2007). In contrast, "the doctrine of waste is a residual protection for stockholders that polices the outer boundaries of the broad field of discretion afforded directors by the business judgment rule." Id. To prove waste, "plaintiff must allege facts showing that no person of ordinary sound business judgment could view the benefits received in the transaction as a fair exchange for the consideration paid by the corporation." Harbor Fin. Partners v. Huizenga, 751 A.2d 879, 891 (Del. Ch. 1999).

Plaintiff argued that Peck committed waste in at least two ways. First, plaintiff asserted that the MSA was so one-sided that it constituted waste. (Pl.'s Prop. Findings of F. and Concls. of L. ("Pl.'s Prop. Findings") at 28.) ACGI did all the work under the MSA but Peck-owned entities received almost the entire profit. (Id.) In addition, plaintiff asserted that the "disappearance" of the Leibovitz

32

settlement funds from the coffers of ACGI was another instance of waste. (Pl.'s Prop. Findings at 29.)

Plaintiff failed to prove waste by a preponderance of the evidence. While the MSA required ACGI to perform tasks that it could have undertaken in its own right, the evidence showed that ACGI was paid for its work to the extent of the NOLs. Plaintiff failed to introduce evidence of the profits earned by the defendant corporations to determine what profits were attributable to the work performed by ACGI or that the amounts paid to ACGI were commercially unreasonable. Harbor Fin. Partners , 751 A.2d at 891.

Plaintiff submitted the Leibovitz loan documents into evidence but presented no credible evidence as regards the division of payments from the Leibovitz settlement. Without information on the content of that settlement, the Court cannot guess as to the reasonableness of the payments received by ACGI.

3. Conversion

Plaintiff's conversion theory is really a separate state common-law theory of recovery rather than part of the breach of fiduciary duty cause of action. In New York, "[c]onversion occurs when a [party] exercises unauthorized dominion over personal property in interference with a[nother party's] legal title or superior right of possession." LoPresti v. Terwilliger, 126 F.3d 34, 41 (2d Cir.1997) (citing Rolls-Royce Motor Cars, Inc. v. Schudroff, 929 F.Supp. 117, 124 (S.D.N.Y.1996)).

In its post-trial briefing, plaintiff pointed to two bases for Peck's alleged wrongful conversion: $2 million in transfers from ACGI to Ian Peck Fine Paintings

33

from 2005-2007, which Peck claimed were repayments of a loan, and the alleged $7 million difference between the Leibovitz loan settlement amount and the principal owed to the banks.  (Pl.'s Post-Trial Br. ¶¶ 49-54.)

While the Court agrees that the transfers as reported by Peck and ACGI in their tax returns and financial statements do not add up, plaintiff did not present evidence as to who had the superior right of possession for either the $2 million in payments to Peck or the $7 million in allegedly missing Leibovitz loan proceeds. Having failed to present evidence of proof of title and right to possession, the Court cannot find that Peck faces liability for conversion.

B.  <u>Second and Third Causes of Action: Aiding and Abetting and Civil Conspiracy</u>

Plaintiff's Amended Complaint states two additional causes of action – for aiding and abetting a breach of fiduciary duty and for civil conspiracy.   Plaintiff failed to present evidence on these causes of action at trial, effectively abandoning them.  Even if it had presented credible evidence, however, plaintiff could not prevail on either as a matter of law.

1.  <u>Civil Conspiracy</u>

Civil conspiracy is dependent upon an underlying tort and the presence of co-conspirators; the latter are missing here.  Under New York law,[4] a corporation may not enter into a conspiracy with its sole owner.  <u>Bereswill v. Yablon</u>, 6 N.Y.2d

---

[4] New York law applies to the civil conspiracy cause of action because, under New York choice of law rules, the location of the underlying tort "generally determines the applicable law" for civil conspiracy and there is no dispute that Peck's alleged wrongdoing occurred in New York. <u>See</u> <u>Steinberg v. Sherman</u>, 07 Civ. 1001 (WHP), 2008 WL 2156726, at *3, (<u>citing</u> <u>AroChem Intern. Inc. v. Buirkle</u>, 968 F.2d 266, 270 (2d Cir.1992).

301, 305-06 (1959).   There is no dispute that Peck was the sole member or shareholder of every one of the defendant companies.  As such, even if Peck committed a tort against Hilton Head, Peck could not conspire with any of his wholly-owned companies and cannot recover under a civil conspiracy cause of action.

### 2.  Aiding and Abetting

Plaintiff's aiding and abetting a breach of fiduciary duty cause of action also fails as a matter of law.  Under Delaware law,[5] only a non-fiduciary aiding a breaching fiduciary may be held liable for aiding and abetting. Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1038-39 (Del. Ch. 2006).  Peck, as a fiduciary of ACGI and the defendant corporations therefore cannot be held liable.

### C.  Remedy

### 1.  Alter Ego Liability

### i.  Conclusions of Law

While the egregious conduct of defendant Peck and the defendant companies has been established, the final question remains as to which defendants may be held liable, and to whom – to ACGI the corporation or to the plaintiff shareholder?

Plaintiff's alter ego liability theory asserts that ACGI is entitled to recover because Peck dominated the defendant companies for the purpose of committing

---

[5] The court will apply Delaware law under the internal affairs doctrine since this is more consistent with the analysis of the fiduciary duty cause of action under Delaware law and ACGI's Delaware incorporation. See Marino v. Grupo Mundial Tenedora, S.A., 810 F. Supp. 2d 601, 612 (S.D.N.Y. 2011)(noting New York courts have legitimately applied "an internal affairs approach, a torts based 'greatest interest' approach, and a hybrid approach to determine the choice of law on an aiding and abetting breach of fiduciary duty claim).

wrongs against ACGI. The alter ego theory is less an independent cause of action but rather a means by which plaintiff may recover from the assets of those entities that would otherwise enjoy the protection of a limited liability shield.

As an initial matter, the Court must set out the choice of law as regards the alter ego theory of recovery. In prior phases of this litigation plaintiff has inconsistently argued as to whether Delaware or New York law should apply to its alter ego theory, but for the sake of consistency under the law of the case doctrine the Court will continue to apply New York law.[6]

Under New York law, the standard for veil-piercing is extremely demanding. A party seeking to pierce the corporate veil under New York law "bear[s] a heavy burden of showing that the corporation was dominated as to the transaction attacked and that such domination was the instrument of fraud or otherwise resulted in wrongful or inequitable consequences." TNS Holdings v. MKI Sec. Corp., 92 N.Y.2d 335, 339 (N.Y. 1998). An alter ego theory requires a showing that the "[corporate] form has been used to achieve fraud, or when the corporation has been so dominated by an individual . . . and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego." Gartner v. Snyder, 607 F.2d 582, 586 (2d Cir. 1979). Given

---

[6] When faced with defendants' motion to dismiss the initial Complaint, both parties agreed to apply New York law. (See Defs.' Memo. of L. in Support of Mot. to Dismiss the Compl.(Dkt No. 33) at 8, Pl.'s Memo. of L. in Opp. to Mot. to Dismiss the Compl. (Dkt No. 34) at 15-16.) In its Opinion on the motion to dismiss the initial Complaint in this matter, the Court examined the governing law and concluded that where both parties consent to apply New York law in an alter ego action, a court will respect that choice. See Hilton Head Holdings b.v. v. Peck et al., 11 Civ. 7768 (KBF), 2012 WL 613729, at *5 n.6 (S.D.N.Y. Feb. 23, 2012). In its post-trial briefs, however, plaintiff cites Delaware law standards in accordance with the "internal affairs" doctrine. (See Pl.'s Post-Trial Br. at 16.) As both states' standards are similarly exacting and account for a similar balancing of equities, the Court will continue to apply New York law to the alter ego analysis.

that standard, a finding that a corporation has been used as an alter ego may be sufficient even where there is no showing of fraud.  See Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd., 909 F.2d 698, 703 (2d Cir. 1990).

"In making this determination, courts look to a variety of factors, including the intermingling of corporate and personal funds, undercapitalization of the corporation, failure to observe corporate formalities such as the maintenance of separate books and records, failure to pay dividends, insolvency at the time of a transaction, siphoning off of funds by the dominant shareholder, and the inactivity of other officers and directors."  Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 18 (2d Cir. 1996)(citing William Wrigley Jr. Co. v. Waters, 890 F.2d 594, 600-01 (2d Cir.1989)).

The Wrigley standard is even more exacting for a small, privately held corporation such as ACGI.  In such a company, "we must avoid an over-rigid preoccupation with questions of structure, financial and accounting sophistication or dividend policy or history."  Id. at 18 (citation omitted).  Though the Second Circuit has not set out a "mechanical rule as to how many and to what degree the factors outlined in Wrigley must be present to pierce the corporate veil," the overarching principle in an alter ego action related to a small, private corporation is "that liability is imposed to reach an equitable result."  Id. (citing Brunswick Corp. v. Waxman, 599 F.2d 34, 36 (2d Cir.1979)).

ii. Analysis

It is proper in this case to pierce the corporate veil and permit recovery from Peck in his personal capacity and from the defendant companies. Even under the exacting standard set forth under New York law, the evidence is clear that Peck dominated ACGI and the Peck companies in all ways. He made all decisions, he determined which bank accounts would be used, which facilities would be used and which personnel would be used – all pursuant to the MSA. As representative of ACGI and three of the defendant companies, Peck signed the MSA in four separate places – the only signatory on the document, agreeing with himself that all of these activities would be done as he had negotiated with himself. (Pl.'s Ex. 7.)

In ACGI, however, Peck was not running a company that he alone owned. He had sold interests in ACGI and had shareholders to whom he was and is accountable. These shareholders held and continue to hold interests in a company that has not been dissolved and that has taken in revenue, had significant assets, and had employees for the last decade. The reasons for that may have to do with Peck's desire to use ACGI's NOL's for his own benefit and for the benefit of the companies in which owned 100% of the interests. No matter the motivation, it is clear that Peck continued to operate ACGI.

As to the defendant companies, Peck ran them all, decided what opportunities went where, how revenues and assets were divvied up – all in a totally opaque manner. There is no doubt that he exercised complete, intermingled,

indistinguishable dominion and control; he also had outside shareholders in one of those companies who were entirely ignored.  He operated all of his companies – including ACGI – as if the outside shareholders did not exist.  The law requires more from fiduciaries.

In addition to Peck's personal liability, it is appropriate to pierce the veil with respect to the defendant companies as well. Peck testified that even he could not readily distinguish the various companies' functions.  Plaintiff introduced evidence demonstrating that the entities operated out of the same address, intermingled funds in the same bank accounts, and all shared the same personnel employed by ACGI.  While defendants argue that the defendant companies respected the corporate form, they introduced no evidence of separate board meetings or minutes, separate books and records, or separate assets.  The evidence showed separate ACG LLC financial statements but the defendants failed to submit the returns of any of the other defendant companies.

In short, the overwhelming evidence is that the defendant companies are a corporate melting pot; equity can provide plaintiff with an appropriate remedy.

### 2. <u>Who may recover</u>

Even as plaintiff has proven defendants' liability by a preponderance of the evidence, the Court must still ask, "to what end?"  May the plaintiff recover directly from the majority shareholder, Peck?  May it recover from the defendant corporations?  Since this is cast as a derivative claim, must all recovery go back to the coffers of ACGI?

i. Conclusions of Law

To determine what remedies the Court may afford plaintiff, the Court examines the nature of the wrong as presented by the pleadings and the evidence, rather than plaintiff's characterization of its causes of action, in order to determine whether the causes of action alleged are derivative – brought on behalf of the corporation to redress an injury to the corporation as a whole – or direct – brought by the individual shareholders to remedy special injuries peculiar to them. See Elster v. Am. Airlines, Inc., 34 Del. Ch. 94, 101 (Del. Ch. 1953) (quoting Selman v. Allen, 121 N.Y.S.2d 142 (N.Y. Sup. Ct. 1953))("The nature of the wrong alleged is what controls, not the pleader's assertion of an intention to sue as representative of the stockholders rather than in the right of the corporation"). Special injury is alleged "where there is a wrong suffered by plaintiff that was not suffered by all stockholders generally or where the wrong involves a contractual right of the stockholders, such as the right to vote." See In re Tri-Star Pictures, Inc., Litig., 634 A.2d 319, 330 (Del. 1993). There is no doubt that Peck, as the dominating (82% - plus) shareholder, stands in a different position from plaintiff. Peck's other companies have received the benefits of the ACGI NOL's, the skills of its personnel by virtue of the MSA, and his ability to shift assets and funds.

Plaintiff's ability to recover under Delaware law is complicated by the derivative nature of the causes of action on which it has proven the corporation is entitled to relief. Breach of fiduciary duty claims such as waste of corporate assets and usurpation of corporate opportunity are derivative claims because the harm

40

done is harm to the corporation and the individual plaintiff shareholder suffers no special harm.  See Kramer v. W. Pac. Indus., Inc., 546 A.2d 348, 353 (Del. 1988)(corporate waste claim is derivative); In re Digex, Inc. S'holders Litig., 789 A.2d 1176 (Del. Ch. Dec. 13, 2000) (same for theft of corporate opportunity).

Normally, in a derivative suit, if an officer or director of a corporation breaches his duties to the corporation, the law imposes a constructive trust for the benefit of the corporation. Guth, 5 A.2d at 510. The product of the transaction will belong to the corporation exclusively, rather than the individual shareholders. See Taormina v. Taormina Corp., 32 Del. Ch. 18, 25 (1951); Keenan v. Eshleman, 23 Del. Ch. 234, 253-54 (1938); Lofland v. Cahall, 13 Del.Ch. 384 (1922); In re West Pan, Inc., 372 B.R. 112, 124 (Bankr. S.D.N.Y. 2007).  In addition, to promote a policy of freedom of contract, Delaware law does not recognize common law buyout of a minority shareholder's interest.[7] See Nixon v. Blackwell, 626 A.2d 1366, 1380-81 (Del. 1993) ("It would do violence to normal corporate practice and our corporation law to fashion an ad hoc ruling which would result in a court-imposed stockholder buy-out for which the parties had not contracted.")

Despite the normal rule whereby damages accrue to the corporation, the Delaware courts have found that courts have limited discretion to fashion an equitable remedy in situations where, as here, a controlling shareholder is alleged

---

[7] Nor can ACGI be considered a close corporation under Delaware law.  Subchapter XIV of the Delaware General Corporation Law, which provides for enhanced protections of minority shareholders in close corporations, "is a narrowly constructed statute which applies only to a corporation which is designated as a 'close corporation' in its certificate of incorporation." Nixon v. Blackwell, 626 A.2d 1366, 1380 (Del. 1993).  ACGI was not incorporated as a close corporation under Subchapter IV. (Defs.' Ex. 1.)

to have breached his duty of loyalty in a particularly egregious fashion and a traditional remedy would be ineffective. See ATR-Kim Eng Fin. Corp. v. Araneta, CIV. A. 489-N, 2006 WL 3783520 (Del. Ch. Dec. 21, 2006), aff'd sub nom., Araneta v. Atr-Kim Fin. Corp., 930 A.2d 928 (Del. 2007). The court in Araneta found such a circumstance where the defendant controlling shareholder had effectively liquidated the assets of the plaintiff corporation and funneled those assets to his family members for his personal benefit. Id., at *1. The court recognized that if it awarded damages to the corporation, the controlling shareholder would likely continue the firm's liquidation and would profit from his own misconduct. Id., at *20. The court employed its equitable power to award the plaintiff minority shareholders the value of their original investment, plus interest and attorney's fees. Id.

### ii. Analysis

Peck's wrongdoing and that of the defendant companies is analogous to the conduct in Araneta, and justifies a limited departure from the normal rule that damages from a derivative suit accrue to the plaintiff corporation. Peck's testimony demonstrated his intent to liquidate the assets of ACGI. He depleted the NOLs via the MSA and engaged in questionable loans and transfers from ACGI to his other controlled entities. As the sole director and 82% shareholder in ACGI, the Court finds that Peck would have the ability to liquidate any recovery from this lawsuit. As a minority shareholder lacking any redemption rights, plaintiff would not be able to stop Peck from engaging in such conduct, nor could it liquidate its shares. The Court acknowledges that Delaware law strongly favors freedom of contract and

42

frowns upon court-imposed dividends or buyouts of minority shareholders; this, however, is one of the very rare situations in which the controlling shareholder's conduct is so egregious – and the plaintiff corporation's prospects for future business so poor – that a direct award is justified.

The Court concludes that the equitable remedy is for Hilton Head to recover its initial investment of $250,002, plus the $50,000 held in escrow pending the resolution of this suit.[8]

## CONCLUSION

As set forth above, this Court finds in favor of Hilton Head Holdings b.v. and orders that Ian Peck, Art Capital Group, Inc., Fine Art Finance LLC, Art Capital Group LLC, ACG Credit Company LLC, ACG Finance Company LLC, ACG Credit Company II LLC, ACG Credit Company III LLC, and American Photography LLC pay Hilton Head Holdings, Inc. $250,002 and that Hilton Head Holdings surrenders its shares to Peck.  No interest or attorneys' fees shall be allowed because plaintiffs made an illiquid investment with no repurchase rights; it is only defendants' conduct that leads to a remedy.  Defendants are further ordered to return the

---

[8] Though the Araneta theory is sufficient to provide plaintiffs individual relief, it is not the only rationale under which plaintiff would be entitled to recover.  For instance, a Delaware court found "special injury" justifying a direct award where the controlling shareholder continued a business under a different corporate umbrella, one which did not involve the plaintiff minority shareholders. See Boyer v. Wilmington Materials, Inc., 754 A.2d 881, 903 (Del. Ch. 1999); accord Fischer v. Fischer, C.A. 16864, 1999 WL 1032768 (Del. Ch. Nov. 4, 1999).  That theory could easily fit the facts here as well.

$50,000 held in escrow pending the outcome of this litigation to Hilton Head in full and with any interest accrued on those funds.

The Clerk of Court shall terminate this action and enter final judgment.


SO ORDERED.

Dated:      New York, New York
            November **20**, 2012


_____
KATHERINE B. FORREST
United States District Judge